UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
- - - - - - - - - - - - -

UNITED STATES OF AMERICA,

               Plaintiff,                       No. 1:11-cr-335

     vs.

                                   Hon. Gordon J. Quist

DAVID WILSON MCQUEEN,            U.S. District Judge
TRENT EDWARD FRANCKE,
JASON ERIC JUBERG,
a/k/a Jason Eric Toader, and
DONALD LAWRENCE JUBERG,

                                   **FOURTH SUPERSEDING
INDICTMENT**

               Defendants.
_____/

     The Grand Jury charges:

## INTRODUCTION

     At all times pertinent hereto, the following relevant facts were true:

***The Defendants***

     1.     DAVID WILSON MCQUEEN is a resident of Byron Center, Michigan, and has worked as a licensed insurance agent and self-proclaimed entrepreneur. Starting in 2005, MCQUEEN founded and operated several investment companies, including Accelerated Income Growth, International Opportunity Consultants, Diversified Liquid Asset Holdings and Diversified Global Finance.  MCQUEEN has

no significant training or experience in finance or investment management and holds no securities licenses.

2.     TRENT EDWARD FRANCKE is a resident of Byron Center, Michigan, and has worked as a licensed real estate agent and broker. FRANCKE was employed by MCQUEEN and aided MCQUEEN in operating MCQUEEN's investment companies.  FRANCKE also operated his own investment-related companies, including Genesis Equity Group, Armex Management Group and Capital Credit Corporation.  FRANCKE has no significant training or experience in finance or investment management and holds no securities licenses.

3.     JASON ERIC JUBERG, also known as Jason Eric Toader, is a resident of Wyoming, Michigan, and worked as a licensed insurance agent and licensed securities broker.  JUBERG owned and operated American Benefits Concepts, Inc. ("ABC") from September 2007 until its dissolution in 2010.  ABC sold insurance products, including medicare supplements, life insurance and annuities.  JUBERG also owned and operated MMA MAGIC, which was established to collect commissions from the sale of MCQUEEN and FRANCKE investments, including Diversified Liquid Asset Holdings and Diversified Global Finance.

4.     DONALD LAWRENCE JUBERG is a resident of Byron Center, Michigan, and worked as a licensed insurance agent for ABC.  JUBERG sold MCQUEEN investments, including Diversified Liquid Asset Holdings and Diversified Global Finance, and collected commissions from those sales.  JUBERG has never been licensed to sell securities.

2

***The Schemes to Defraud***

5.     Starting in 2005, MCQUEEN and FRANCKE executed a scheme to defraud investors out of at least $46,500,000.  MCQUEEN, FRANCKE, and others known and unknown to the Grand Jury, induced individuals to invest in Accelerated Income Group, International Opportunity Consultants, Diversified Global Finance and/or Diversified Liquid Asset Holdings by representing to investors that those companies were so successful that they could deliver guaranteed returns to investors of 1-5% per month.  In truth and fact, MCQUEEN and FRANCKE used most of the investor funds they received to pay themselves exorbitant salaries, pay personal or unrelated business expenses, pay commissions to those that referred investors to the funds, and make bogus "interest" payments back to investors.  The remaining funds were squandered on poor investments or get-rich-quick schemes, contrary to the representations made by MCQUEEN and FRANCKE.

6.     Starting in 2007, FRANCKE executed a separate scheme to defraud investors out of at least $3,500,000.  FRANCKE, and others known and unknown to the Grand Jury, induced individuals to invest in Genesis Equity Group and Armex Management by representing to investors that those companies were so successful that they could deliver guaranteed returns to investors of 4-6% per month.  In truth and fact, FRANCKE used most of the investor funds he received to pay himself a salary, pay personal or unrelated business expenses, pay commissions to those that referred investors, and make bogus "interest" payments back to investors.  The

remaining funds were squandered on poor investments, contrary to the representations made by FRANCKE.

7. MCQUEEN and FRANCKE made direct solicitations to investors to sell their investments but also recruited others to sell their investments for them. MCQUEEN and FRANCKE often relied upon insurance agents like JASON JUBERG and DONALD JUBERG who could capitalize on existing client relationships and methods of marketing investment and insurance products to the public. Investors, many of them retired and/or elderly, trusted their insurance agents, who vouched for MCQUEEN and FRANCKE as legitimate and successful businessmen. Those agents encouraged their clients to invest their life savings, cash out their IRAs and/or mortgage their homes to invest with one of MCQUEEN and/or FRANCKE's companies. Agents fed tens of millions of investor dollars into the schemes orchestrated by MCQUEEN and FRANCKE. In return, the agents were rewarded with exorbitant commissions based on a percentage of what they had sold.

***The Investment Companies***

    ***Accelerated Income Group***

8. Near the end of 2005, MCQUEEN formed a "private investment group" called Accelerated Income Group ("AIG"). MCQUEEN represented to potential investors that AIG, through MCQUEEN, had established contacts with stock and currency traders who could deliver exceptional returns on AIG's investments, as high as 100% per year or more. During face-to-face meetings and in documentation

supplied to investors, MCQUEEN and FRANCKE represented that they would share AIG's investment success with investors. MCQUEEN and FRANCKE promised that, in return for placing funds with AIG, investors would receive returns of 3-5% per month. MCQUEEN and FRANCKE told investors that their investments were guaranteed and they were backed by the assets of AIG, which included significant real estate holdings.

9.      MCQUEEN and FRANCKE represented to investors that they would not pay any fees or commissions as part of their investment. Instead, MCQUEEN and FRANCKE represented that AIG would only keep the return on AIG's investments in excess of that amount they promised to return to the investor. MCQUEEN and FRANCKE promised returns of a minimum of 3% per month because they represented that AIG made profits in excess of that amount.

10.     From 2005 through 2008, AIG took in more than $9,000,000 from investors. Instead of investing those funds as promised, MCQUEEN and FRANCKE began living off investor funds, and making payments on their personal and business debts. In total, approximately $1,500,000 of AIG investor funds was diverted to MCQUEEN, and approximately $750,000 was diverted to FRANCKE.

11.     MCQUEEN used AIG investor funds to pay commissions to friends and colleagues in the insurance business who became the de facto sales team for AIG and MCQUEEN's other investment companies, directing millions of investor dollars to MCQUEEN for investment. Unknown to those who invested with AIG, MCQUEEN paid commissions of up to 2% per month for as long as the investor

remained in the fund.  In total, MCQUEEN paid more than $700,000 in commissions using AIG investor funds to those who referred investors to AIG.

12.  MCQUEEN and FRANCKE made "interest" payments back to AIG investors to make it appear that their investment was generating a legitimate return, when it was not.  The money used to make those interest payments came not from investment profits but from AIG investors, as well as investors in other funds controlled by MCQUEEN and FRANCKE.  Those interest payments were accompanied by monthly statements that falsely represented that the investors' principal had been invested as promised, and was safe and growing.

13.  To the extent MCQUEEN actually made investments with investor funds, those investments never generated any significant gains and resulted in substantial losses.  Even after suffering those losses, however, MCQUEEN and FRANCKE continued to tout the purported successes of AIG to investors.

### International Opportunity Consultants

14.  In 2007, MCQUEEN created another investment fund, International Opportunity Consultants ("IOC").  MCQUEEN and FRANCKE told investors that IOC was an international fund that would act as a holding tank to take their investment opportunities worldwide.  IOC purportedly invested in currency trading, real estate, ethanol and other undefined opportunities. MCQUEEN, FRANCKE and others known and unknown to the Grand Jury promised returns to investors of 3% or more per month.  MCQUEEN and FRANCKE told investors that

they could not lose their principal because their investment was backed by the assets of IOC.

15.     As with AIG, MCQUEEN and FRANCKE represented to investors that they would not pay any fees or commissions as part of their investment. MCQUEEN and FRANCKE represented that their companies earned money by generating returns in excess of that promised to the investor.   They represented that they were able to promise returns of a minimum of 3% per month because they were making returns in excess of that amount.

16.     During 2007 and 2008, IOC took in nearly $14,000,000 from investors. Instead of investing those funds as promised, MCQUEEN and FRANCKE used a large portion of those funds to pay personal and unrelated business expenses.  In total, approximately $1,500,000 of IOC investor funds was diverted directly to MCQUEEN and approximately $450,000 was diverted to FRANCKE.  MCQUEEN also gave his then-wife $135,000 directly from IOC investor funds.

17.     MCQUEEN used approximately $1,900,000 in investor funds to meet IOC commission obligations for referrals to IOC and AIG.  Neither MCQUEEN nor FRANCKE disclosed to investors that a substantial portion of their investment would be used to pay commissions.

18.     MCQUEEN and FRANCKE made "interest" payments back to the investors to make it appear that their investment was generating interest, when it was not.  The money used to make those interest payments came from IOC investors, as well as investors in other funds controlled by MCQUEEN and

FRANCKE.   Those interest payments were accompanied by monthly statements that falsely represented that the investors' principal was safe and growing.

19.   To the extent MCQUEEN actually made investments with investor funds, those investments never generated any significant gains and resulted in the loss of nearly all of the investors' principal.   Despite those losses, MCQUEEN and FRANCKE continued to tout the purported successes of IOC to investors.

### Diversified Liquid Assets Holdings

20.   In late 2007 into early 2008, MCQUEEN started another investment company called Diversified Liquid Assets Holdings ("DLAH"), which purportedly was formed to facilitate the production of ethanol and profit from its sale.  Shortly thereafter, JASON JUBERG entered into an agreement with MCQUEEN, whereby JUBERG, who had recently purchased an insurance agency called American Benefits Concepts ("ABC"), could market and sell DLAH securities.

### Jason Juberg's Purchase of ABC

21.    JASON JUBERG and his father, DONALD JUBERG were longtime insurance agents affiliated with ABC.   The JUBERGs made millions of dollars working with ABC selling medicare supplements to senior citizens, along with other insurance products, including annuities.

22.   In 2007, JASON and DONALD JUBERG pressured the then-owner of ABC to allow them to sell a new product called Diversified Lending Group ("DLG"). DLG was owned and operated by California businessman Bruce Friedman, who was later indicted on fraud charges when it was alleged that DLG was a Ponzi scheme.

JASON and DONALD JUBERG wanted to market and sell DLG securities because DLG's "guaranteed" returns of 12% would be easy to sell to ABC's target market: senior citizens who needed steady, fixed income.

23. Despite JASON and DONALD JUBERG's persistent requests, ABC's owner forbade the sale of DLG citing concerns that DLG was an unregistered security that should not be sold by ABC's insurance agent sales force. Unable to convince the owner of ABC to allow him to sell DLG securities, JASON JUBERG, along with his colleague, Matthew Harper, borrowed money to purchase ABC in 2007 for $5,000,000.

24. Upon obtaining control of ABC, JASON and DONALD JUBERG disregarded the warnings of the former owner of the agency and aggressively sold DLG securities to their existing ABC clients and to the public through general solicitation, by promising them "guaranteed" returns of 12% per year. Further, JASON JUBERG pressured ABC agents to sell DLG securities whenever possible. JASON JUBERG, as owner of the agency, took a portion of all sales of DLG securities. Those sales were critical to generating enough revenue to service the debt incurred as a result of the purchase of ABC.

25. By April 2008, JASON and DONALD JUBERG learned that the Michigan Office of Finance and Insurance Regulation ("OFIR") had launched an investigation into DLG and ABC for potential securities violations in connection with the sale of DLG securities. Upon learning of the OFIR inquiry, DLG ceased selling DLG investments in Michigan, including through ABC.

### *ABC's offer and sale of DLAH*

26.    Without the steady stream of revenue provided by the sale of DLG securities, JASON JUBERG turned to MCQUEEN to provide an investment product that he and his agents could sell that would replace the high commissions previously received from the sale of DLG.  Further, JUBERG and his agents had a substantial number of DLG securities that had been recently sold but had yet to be processed by DLG.  JUBERG needed a product that he could sell in place of DLG.

27.    MCQUEEN agreed that JUBERG and his agents would have the exclusive right to sell DLAH and could offer the same 12% guaranteed return offered by DLG.   To avoid more scrutiny from OFIR or other regulatory agencies such as the United States Securities and Exchange Commission ("SEC"), JUBERG and MCQUEEN structured DLAH as a "Joint Venture" that would be sold to a limited number of  "accredited" and "sophisticated" investors.  DLAH would provide financial statements and make other disclosures prior to investment so that the investors could make an educated decision before investing.  In addition, JUBERG and his agents would not sell DLAH securities or receive commissions, but would only refer their existing clients (who also were accredited and sophisticated investors) to MCQUEEN in exchange for "consulting fees."   MCQUEEN and JUBERG hoped that by structuring the sale of DLAH securities in this manner, those securities would be exempt from registration.

28.    Despite purportedly establishing DLAH as an investment for a limited number of accredited and sophisticated investors, MCQUEEN, FRANCKE, JASON

JUBERG, DONALD JUBERG and others sold DLAH securities to whomever they could convince to buy it. MCQUEEN, FRANCKE, JASON JUBERG, DONALD JUBERG and others targeted elderly, non-accredited, unsophisticated investors throughout the United States that typically bought medicare supplements from ABC insurance agents. MCQUEEN, FRANCKE, JASON JUBERG, and DONALD JUBERG and others disregarded the financial situation and sophistication of their targets and sold DLAH securities by promising that investors funds would be completely safe and "guaranteed" to return 12% per year.

29. MCQUEEN, FRANCKE, JASON JUBERG, and DONALD JUBERG told investors that their investment was completely safe and guaranteed. DLAH guaranteed returns of 1% per month to investors. MCQUEEN, FRANCKE, JASON JUBERG and DONALD JUBERG represented that DLAH could guarantee those returns because of its ongoing production of ethanol and other purportedly lucrative investments that never actually existed.

30. MCQUEEN, FRANCKE, JASON JUBERG and DONALD JUBERG never provided any financial statements or investment literature of any kind to any of the investors concerning their investment. Instead, investors were forced to rely upon the false representations made by MCQUEEN, FRANCKE, JASON JUBERG, DONALD JUBERG and others that DLAH was a financially stable company with substantial assets to cover the investors' principal investment. MCQUEEN, FRANCKE, JASON JUBERG, DONALD JUBERG and others told DLAH investors that DLAH had already garnered impressive profits from DLAH's ethanol plants

and other investments and that they expected similar returns in the future. MCQUEEN, FRANCKE, JASON JUBERG and DONALD JUBERG made those representations knowing that they were untrue, or acting in deliberate ignorance of the fact that they were untrue.

31.     JASON JUBERG, as owner of ABC, pressured ABC's agent sales force to sell DLAH securities to their clients, even if those clients could not afford to invest.  JASON JUBERG counseled ABC agents to convince investors who lacked resources to mortgage their homes and cash in their IRAs and use the money to invest in DLAH.   JUBERG and DONALD JUBERG trained ABC's agents to tell investors that they could not lose their home because the rate of return from DLAH would more than cover the mortgage payment, providing easy access to investment funds, and a solid return above the mortgage payment.

32.     MCQUEEN, FRANCKE, JASON JUBERG, DONALD JUBERG and others represented that investors would not pay fees or commissions on their investment into DLAH.  Instead, DLAH would only keep the return on DLAH's investments in excess of that promised to the investor.  MCQUEEN, FRANCKE, JASON JUBERG and DONALD JUBERG and others led investors to believe that DLAH was able to return 1% per month to investors because DLAH ethanol production was producing returns of at least 2% per month.

33.     During the life of the DLAH investment, DLAH took in approximately $13,000,000 from investors. Instead of investing the investors' funds as promised, MCQUEEN and FRANCKE used DLAH investor funds to satisfy obligations of

other ventures unrelated to DLAH. Of the $13,000,000 invested with DLAH, MCQUEEN and FRANCKE invested approximately $900,000 in purported ethanol ventures. The remaining DLAH investor funds were transferred to other accounts and/or used to pay salary and personal expenses, make interest payments and satisfy redemption requests by investors from AIG, IOC and DLAH.

34.     MCQUEEN paid commissions to JASON JUBERG through JUBERG's company MMA Magic, which was established for the sole purpose of receiving money from MCQUEEN. From May 2008 through February 2009, MMA Magic received over $1,100,000 in commissions from the sale of DLAH. In turn, JUBERG would split the commissions with Matthew Harper, DONALD JUBERG and other selling agents.

### Diversified Global Financing

35.     By 2007 or earlier, MCQUEEN and FRANCKE were aware that the investment products they sold to investors were unregistered securities, and that with each sale they violated various State and Federal securities laws. In an attempt to correct their prior securities violations and to get into "compliance," MCQUEEN and FRANCKE used investor funds to retain several accountants and attorneys, who educated them on the proper methods to sell securities in the United States. Because MCQUEEN and FRANCKE ran Ponzi schemes – not legitimate investment companies – they could not possibly comply with the disclosure and registration requirements associated with the sale of a security without revealing to investors that they were running a scheme to defraud. To avoid detection of their

scheme to defraud, MCQUEEN and FRANCKE abandoned any attempt to comply with securities laws, and took their operations "offshore" to New Zealand, where they hoped to be out of the reach of Federal regulators.

36.     To accomplish the task of moving their operations overseas, in the fall of 2008, MCQUEEN established Diversified Global Finance ("DGF").  DGF was established as a New Zealand finance company that, like DLAH, promised guaranteed returns of 12% or higher.  Like AIG, IOC and DLAH, DGF purportedly invested in various vague and undefined "opportunities" throughout the world.

37.     In 2008, MCQUEEN and FRANCKE contacted existing AIG and IOC investors and notified them of the new offshore company, and that all existing AIG and IOC investors would be rolled-over into the new fund.  In addition, MCQUEEN notified JASON JUBERG that he should now sell DGF securities in lieu of DLAH.

38.     As part of the roll out of DGF, the AIG and IOC funds would be discontinued.  AIG and IOC investors were given the choice of either cashing out their investment or rolling some or all of their investment into DGF. MCQUEEN and FRANCKE, and others known and unknown to the Grand Jury, conducted meetings in Grand Rapids, Michigan; Fort Wayne, Indiana; Indianapolis, Indiana; and other places to pitch the new DGF fund.  At those meetings, MCQUEEN and FRANCKE and others represented to existing investors that AIG and IOC were still very successful, but that market conditions necessitated that they consolidate those funds into DGF and offer a different rate of return.   MCQUEEN and FRANCKE guaranteed DGF investors returns of 12% per year on their accounts plus "50% of

the net profit" made on DGF's investments. Those returns supposedly would be backed by the assets of the company and/or "backed by Gold."

39.     At the DGF roll-over meetings, AIG and IOC investors were presented with checks in the amount of the balances that MCQUEEN and FRANCKE claimed were in their accounts. If an investor did not wish to participate in DGF, the investor could take their check and leave. If an investor wished to roll over their investment into DGF, the investor simply endorsed the back of their check and returned it to MCQUEEN and FRANCKE, who promised to deposit the investors' checks into a DGF account. MCQUEEN and FRANCKE represented that once investors placed their funds with DGF, MCQUEEN and FRANCKE would transfer those funds into their individual investor accounts located in New Zealand. From there, MCQUEEN would invest the money in currency trading, green energy investments or other unspecified opportunities.

40.     Unknown to the investors, MCQUEEN and FRANCKE did not have sufficient funds or assets to cover all the checks written to investors. During the roll-over process, MCQUEEN drafted checks to AIG and IOC investors in excess of $27,000,000 drawn on AIG and IOC accounts, but those accounts contained only a fraction of that amount. Moreover, neither AIG nor IOC held significant other assets or investments that could be liquidated to cover the checks.

41.     To ensure that AIG and IOC could cover at least a portion of the checks written at the DGF meetings, MCQUEEN and FRANCKE staggered the pitch meetings in order to limit the number of checks written at one time.

15

MCQUEEN could then move the funds among and between his investment companies to avoid bouncing any checks if an investor chose to cash his check, using the remaining funds AIG and IOC had available.

42. Because AIG and IOC did not have sufficient funds to cover the checks written during the roll-over into DGF, most checks would have bounced if all investors had chosen to walk away and decline MCQUEEN and FRANCKE's pitch to invest into DGF. MCQUEEN and FRANCKE's promises of guaranteed returns, however, enticed most investors to roll over their AIG and IOC investments into DGF.

43. Those investors who did invest with DGF were required to endorse their checks for deposit into a "Capital Credit" account, a company created by FRANCKE purportedly to facilitate the transfer of funds overseas to DGF. MCQUEEN and FRANCKE told investors that they would deposit the investors' endorsed checks into a Capital Credit account, and then they would transfer their investment to their new individual DGF investment account.

44. Because AIG and IOC did not have sufficient funds to cover all of the AIG and IOC checks, MCQUEEN and FRANCKE could not deposit them into the Capital Credit account as promised. To complete the roll-over into DGF, MCQUEEN periodically deposited some of the AIG and IOC investor checks by moving existing funds or newly-obtained investor funds into the AIG and IOC accounts. After those checks had cleared and funds had been moved from AIG and/or IOC accounts to Capital Credit, MCQUEEN would move the money back to

AIG or IOC accounts.  MCQUEEN repeated that process until all the checks had been "deposited" into the Capital Credit account.  Because MCQUEEN was simply using the same funds again and again to cover the AIG and IOC roll-over checks, only a portion of those investor funds were actually deposited into DGF accounts.

45.     By the fall of 2008, AIG and IOC were empty shells that had no real assets.   Fortunately for MCQUEEN and FRANCKE, JASON JUBERG and DONALD JUBERG and other ABC agents had sold approximately $20,000,000 of DLAH and new DGF investments, which MCQUEEN and FRANCKE used to negotiate any checks written to roll former AIG and IOC investors into DGF accounts.  That same money was also used to satisfy any bogus "interest" payments that needed to be made, along with satisfying any redemption requests.

46.     DGF investors believed that, upon deposit into the Capital Credit accounts, MCQUEEN and FRANCKE would transfer their funds to their individual DGF investment accounts in New Zealand.  DGF investors were directed to a DGF website which provided current balances in each of the investors' accounts.  Those balances did not actually exist.  Of those investor funds that MCQUEEN and FRANCKE deposited into the Capital Credit account, MCQUEEN and FRANCKE used a large portion for personal use, to make "interest" payments and redemption requests, and for the payment of unrelated business expenses.  Of the approximate $33,600,000 that investors believed had been deposited into DGF accounts overseas, MCQUEEN and FRANCKE transferred approximately $4,500,000.

47.     MCQUEEN transferred the approximate $4,500,000 of DGF investor funds into a general account in New Zealand called "Diversified Global Finance Trust," and the funds were later disbursed.  MCQUEEN used those funds to make investor "interest" payments and redemption requests and pay personal expenses.

### *Genesis and Armex*

48.     In 2007, FRANCKE started two new investment companies called Genesis Equity Group and Armex Management.  Genesis and Armex purportedly invested in green energy products such as ethanol, real estate deals, currency trading and other unspecified opportunities.  FRANCKE represented to investors that Genesis and Armex had significant assets, including real estate holdings, currency and gold.  FRANCKE and others told investors that Genesis and Armex companies had already garnered impressive returns from their various investments.

49.     FRANCKE guaranteed returns of as high as 4-6% per month based on the purported success of his investments.    FRANCKE represented that he would only keep the return on Genesis and Armex's investments in excess of that promised to the investor.  FRANCKE led investors to believe that he was able to return 4-6% per month to investors because his investments were producing returns of at least 7% per month.  FRANCKE also failed to inform investors that he paid commissions on their investment into Genesis and Armex.

50.     During the life of the Genesis and Armex, FRANCKE took in approximately $3,872,000 from investors.  Instead of investing the investors' funds in legitimate green energy ventures, real estate deals, currency trading and other

opportunities as promised, FRANCKE used investor funds to pay personal expenses, commissions to those that had sold Genesis and Armex on FRANCKE's behalf, and make bogus interest payments back to investors or honor redemption requests.  To the extent that FRANCKE actually invested any money in any business venture, those investments resulted in a loss.

**AIG, IOC, DGF, DLAH, Genesis and Armex Investments**

51.    MCQUEEN, FRANCKE and others known and unknown to the Grand Jury convinced investors to invest in AIG, IOC, DGF, DLAH, Genesis and Armex by promising them inordinately high rates of return.  MCQUEEN and FRANCKE told investors, and those that sold their investments for them, that AIG, IOC, DLAH, DGF, Genesis and Armex had taken advantage of various "opportunities" that consistently yielded returns in excess of 5% per month.  In reality, to the extent they actually made investments, those investments yielded catastrophic losses, including the following:

A.    Currency and Stock Trading - MCQUEEN and FRANCKE represented to investors that they had a stable of currency and stock traders that consistently yielded returns as high as "over 100 percent" per year.  In fact, MCQUEEN and FRANCKE lost most of the money invested with those traders. For example, AIG and IOC invested approximately $3,200,000 of AIG investor money with a Florida company called Multiple Returns Transactions ("MRT"). Although it initially appeared on paper that AIG was reaping significant returns from its investment, during the early fall of 2007, MRT stopped answering

investors' telephone calls, fulfilling redemption requests or responding to investors' emails. Shortly thereafter, the United States Securities and Exchange Commission filed a complaint against MRT. Despite knowing that MRT was no longer operating and that AIG investor funds were likely lost, MCQUEEN and FRANCKE continued to tout AIG's investment success and make "interest" payments back to investors knowing that those payments came from investor funds. In October 2008, at the same time MCQUEEN and FRANCKE began requesting that investors "roll over" their AIG and IOC investments to DGF, MCQUEEN and AIG filed a lawsuit against MRT. Neither MCQUEEN nor FRANCKE nor anyone else associated with AIG ever told investors that a lawsuit had been filed by AIG and MCQUEEN against MRT, or that AIG had lost millions of investor dollars in MRT.

      B.    Real Estate - MCQUEEN and FRANCKE told investors that their companies held title to many valuable properties that provided consistent returns from rents and resale, and that could be sold to meet redemption requests if necessary. In fact, to the extent any real estate holdings existed, those properties were titled in MCQUEEN's name or the names of nominees recruited by MCQUEEN. MCQUEEN and FRANCKE used investor funds to maintain and pay mortgages on MCQUEEN's properties despite knowing that those properties were not owned by AIG, IOC, DLAH, DGF, Genesis or Armex. Further, those properties generated no revenue and had no equity.

      C.    Green Energy - MCQUEEN and FRANCKE told IOC, DLAH, DGF, Genesis and Armex investors that they had invested heavily in ethanol and

other green energy projects and that those investments were returning handsome profits. For example, MCQUEEN and FRANCKE told investors that they had a fully operational and profitable ethanol refinery in Antlers, Oklahoma. Defendants also claimed to hold exclusive rights to build another such refinery in Hawaii, which could be exercised following the secession of the State of Hawaii from the United States. Defendants also claimed that they had guaranteed contracts with the Department of Defense for one million gallons of ethanol production per year, which created a steady source of revenue for their ethanol-related projects. Defendants also claimed that they held exclusive rights to sell very profitable "mobile" ethanol labs in Vietnam, a portion of those profits going to assist victims of Agent Orange poisoning. Not one of those representations was true and none of those projects produced any revenue, or any marketable ethanol.

D.     Other "Opportunities" - MCQUEEN and FRANCKE represented to investors that they generated huge returns on investment by investing in various vague and undefined "opportunities." In truth and fact, those opportunities were incredibly speculative get-rich-quick schemes or outright frauds. Neither MCQUEEN nor FRANCKE ever disclosed to investors the true nature of these investments or that they had lost the entirety of the investment. For example, MCQUEEN placed investor funds with the following "opportunities":

1.     JC Funding: MCQUEEN transferred $1,200,000 of IOC and DGF investor money to JC Funding which promised a return of $400,000,000 within 40 weeks on IOC's $1,200,000 investment. JC Funding purportedly had

21

"professional relationships in the financial industry" that "could achieve significant yields through the purchase and resale of financial instruments issued by recognized financial institutions."  IOC and DGF lost the entire $1,200,000 transferred to JC Funding.

           2.     Alliance Asset Management:  MCQUEEN transferred $500,000 of IOC investor funds to Alliance Asset Management, which, in return, promised a "capital infusion" of $100,000,000 to IOC, so that IOC could develop certain real estate projects.  IOC was required to provide payments of $20,000,000 per year plus 50% of its profits to Alliance Asset Management.  When Alliance Asset Management failed to provide the $100,000,000 capital infusion as promised, IOC received its initial $500,000 back, but continued to make monthly payments of $15,000 to Alliance Asset Management, resulting in a loss of over $150,000.

           3.     HMI Management: MCQUEEN transferred $500,000 of IOC investor funds to a company called HMI Management, which purportedly intended to use those funds "for the inducement of a financial transaction" with Morgan Stanley.  HMI promised a return of $2,000,000 within 60 days.  IOC never received any money back from HMI.

           4.     BRS Labs: MCQUEEN took $1,500,000 of AIG investor funds and invested it in his own name into BRS Labs, a technology company that purportedly had advanced security technology that was sought after by government agencies.  BRS Labs never returned any profit on the investment or returned the principal.

***Efforts to Lull Investors***

52.     Despite knowing that they had spent or lost nearly all of the money invested with AIG, IOC, DLAH, DGF, Genesis and Armex, MCQUEEN and FRANCKE sent out monthly interest payments to investors.   Those interest payments came from the investors' principal or from new investor money.   Along with those monthly payments, MCQUEEN and FRANCKE mailed account statements reflecting substantial profits made by investors on their investments. Those statements included the following material misrepresentations designed to lull investors:

A.     The account statements contained fabricated account balances, interest earned amounts and interest rate figures.

B.     The account statements referenced account activity that did not actually occur and gave the impression that the investor had a separate account where their assets were kept and that their money was actually invested as promised.

C.     The account statements represented that interest earned on investment was added to existing balances increasing the amount of their investment, when actually the investors' balances were being siphoned away by MCQUEEN and FRANCKE.

53.     MCQUEEN and FRANCKE also used investor funds to hire a series of accountants and lawyers, hoping to lend credibility to their various investment companies, and convince investors that MCQUEEN, FRANCKE and their

companies had been vetted by licensed professionals.  Some of those accountants and lawyers, after reviewing the few materials that MCQUEEN and FRANCKE turned over to them, refused to assist MCQUEEN and FRANCKE further.  Others advised MCQUEEN and FRANCKE of the proper methods to sell investment securities and they purposefully disregarded their advice.  Neither MCQUEEN nor FRANCKE disclosed to investors that they used investor money to pay lawyers and accountants, nor did they disclose any adverse opinions or advice provided to them by those lawyers and accountants.

54.     MCQUEEN and FRANCKE also attempted to bolster their credibility by telling investors that they were "Christians" who preferred to deal with God-fearing, churchgoing people.  MCQUEEN's catch phrase was that he was "blessed to be blessing," and told investors that he wished to share his ability to make money with others.  MCQUEEN contributed hundreds of thousands of investor dollars to his church claiming that he made those contributions with his own money.  MCQUEEN and FRANCKE also represented to investors that a portion of company profits was given to charity.  In truth, MCQUEEN and FRANCKE were simply living off the investors' money, and to the extent they gave money to any charitable or church organization it was investor money – not their profits – and was designed to convince investors that they were devout Christians, whose religious beliefs made them trustworthy.

*Concealment of Assets*

### *Jason and Donald Juberg*

55.     After receiving inquiries from OFIR in late 2007 and early 2008 regarding the sale of DLG, JASON and DONALD JUBERG became concerned that State or Federal agencies would seek to bring actions against them for violating securities laws, or otherwise attempt to seize their assets.  In April 2008, OFIR had effectively shut down the sale of DLG securities in the State of Michigan.  Shortly thereafter, the United States Securities and Exchange Commission revealed that it had a pending investigation against DLG.  Despite knowing of the existence of those investigations, JASON and DONALD JUBERG continued to sell the very similar DLAH and DGF investment securities offered by MCQUEEN.  By early 2009, DLG was revealed as a Ponzi scheme, and its owner, Bruce Friedman, fled the country. Knowing that ABC DLAH and DGF were also the subject of ongoing investigations, JASON JUBERG began to warn his close confidants of the potential for investor lawsuits and that the "FBI was coming" and that they should hide their assets.

56.     In March 2009, fearing that federal investigators and creditors were about to seize assets from the sale of DLG, DLAH and DGF, JASON JUBERG concocted a plan to protect $540,000 that JASON JUBERG had taken from ABC bank accounts.  JUBERG transferred those proceeds to his MMA Magic account and from there wired $400,000 to Penny Hodge.   JUBERG asked Hodge to invest the money so that he could protect it from seizure by creditors or law enforcement. Although JUBERG transferred the money to Hodge purportedly for investment,

Hodge agreed that she would pay JUBERG's expenses, including payments for luxury vehicles, vacations, clothing, jewelry and other personal expenses.  While the "investment" would be out of the reach of creditors or law enforcement, JUBERG would still be able to live and conduct business in the manner to which he had grown accustomed.

57.     On or about June 9, 2009, DONALD JUBERG took the proceeds of a $300,000 mortgage on his house and also gave the money to Hodge.   DONALD JUBERG told others that the sole purpose of the transaction was to "strip" the remaining equity from his house before any creditors or State or Federal agencies could seize it.  DONALD JUBERG told Hodge that he needed to protect his money from seizure and that he wanted her to hold it until he asked for it back.  Hodge agreed that she would "invest" JUBERG's money while he kept it away from creditors or law enforcement, and would return some or all of it back to him when he asked for it.

58.     In total, JASON JUBERG, DONALD JUBERG and others gave Hodge $800,000 for the purpose of hiding it from potential seizure.

### David McQueen

59.     During the course of the scheme to defraud investors, MCQUEEN conducted financial transactions designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of wire fraud and securities fraud.  For example, on or about June 16, 2008, MCQUEEN contacted his business associate John Bertuca and told him he was going to give

him $345,000 which he would call a "marketing" expense, knowing that it was not. Shortly after Bertuca received the funds, McQueen provided him with a list of McQueen's personal expenses that Bertuca should pay out of the $345,000, including the payoff of a boat loan. MCQUEEN and Bertuca agreed that they would treat the transfer as a "marketing" expense to disguise the ownership and control of the funds.

60. On or about August 24, 2009, Federal authorities executed search warrants on MCQUEEN and FRANCKE's business locations and their residences. Authorities also seized assets in the United States that had been identified as the proceeds of fraud. After the execution of the search warrants, MCQUEEN and FRANCKE notified investors that all of the investors' accounts had been seized, effectively shutting down their businesses. MCQUEEN and FRANCKE told investors that all of their money still existed but had been frozen due to unwarranted government action. MCQUEEN and FRANCKE failed to tell investors that at that time, only of a small portion of investor funds actually remained, and the vast majority of investor funds had been spent and squandered. The government was able to locate and seize only $433,467 of investor funds in the United States.

61. MCQUEEN and FRANCKE also failed to tell investors that $605,125 of investor funds remained in DGF accounts in New Zealand, outside of the reach of United States' seizure authority. Instead of preserving that investor money for investors, MCQUEEN sought to hide the money from investigators and investors.

62.     MCQUEEN wire transferred $120,000 of the remaining investor assets to a company created by Penny Hodge called Marble City World on June 18, 2010. MCQUEEN made a second wire transfer of $119,975 on June 30, 2010, and a third wire transfer of $17,353 on July 16, 2010.  The purpose of the wire transfers purportedly was to invest in a movie produced by Hodge, who has no experience whatsoever in movie production.  No movie was ever made by Hodge.

63.     After receiving investor proceeds from MCQUEEN, Hodge disbursed some of the money to pay for some of MCQUEEN's expenses.  Hodge also provided cash back to MCQUEEN in exchange for a boat.  MCQUEEN later retrieved the boat from Hodge, but did not return the cash.

64.     MCQUEEN dissipated all of the investor funds in New Zealand accounts, and no investor funds remain.

## COUNTS 1-8
### (Mail Fraud)

65.    The Grand Jury incorporates into Counts 1-8, specifically and by reference and as if stated therein, the allegations and assertions stated in paragraphs 1-64.   From the fall of 2005 through on or about January 21, 2011, in the Western District of Michigan, Southern Division, and elsewhere,

### DAVID WILSON MCQUEEN and
### TRENT EDWARD FRANCKE

did knowingly, and with the intent to defraud, devise a scheme and artifice to defraud and to obtain money and property by means of material false and fraudulent pretenses, representations and promises.

### MEANS AND METHODS

66.    It was part of the scheme to defraud that Defendants falsely and fraudulently represented to investors that Defendants' investment companies AIG, IOC, DLAH and DGF made millions of dollars investing in currency and stock trading, ethanol, real estate and other investments, and had a sufficient revenue to satisfy returns of 1-5% per month to investors.

67.    It was further part of the scheme to defraud that Defendants falsely and fraudulently led investors to believe that their investments were safe and guaranteed and backed by the supposedly significant assets of the companies.

68.    It was further part of the scheme to defraud that Defendants falsely and fraudulently represented to investors that they would take no fees or commissions out of their investments and only made money by generating profits

above and beyond what they paid back to investors when, in fact, Defendants diverted millions of investor dollars to themselves and to pay commissions to those that referred them new investors.

69.    It was further part of the scheme to defraud that, to convince investors that their money was generating profits from their investments, Defendants made monthly payments to investors using the investors' principal investment or new investor funds and disguising those payments as "interest."

70.    It was further part of the scheme to defraud that Defendants failed to disclose to investors that they made interest payments and satisfied redemption requests with other investors' funds.

71.    It was further part of the scheme to defraud that Defendants improperly commingled funds between AIG, IOC, DGF and DLAH to meet the debts and obligations of those funds, including salaries, commissions, redemption requests and interest payments.

72.    It was further part of the scheme to defraud that Defendants mailed false and misleading monthly account statements that contained material misrepresentations, fabricated account balances, interest earned amounts and interest rate figures.

73.    It was further part of the scheme to defraud that Defendants used investor funds to retain accountants and attorneys to give their investment funds the appearance of legitimacy by claiming that those licensed professionals had vetted their investments.

74. It was further part of the scheme to defraud that Defendants would prey upon vulnerable individuals, including the elderly, who often mortgaged their homes or cashed in their retirement accounts to invest with Defendants.

75. It was further part of the scheme to defraud that Defendants used their affiliation with certain churches to lure investors. Defendants attempted to bolster their credibility by explaining to investors that they were "blessed to be blessing" and gave a portion of their profits to charity.

76. It was further part of the scheme to defraud that Defendants failed to return money to investors, including in most cases all or substantially all of the money the investors had placed with Defendants.

### THE MAILINGS

77. In order to execute the scheme, Defendants did send through the Postal Service in the Western District of Michigan and knowingly cause to be sent, delivered and received from the Postal Service, according to the directions thereon, the items and things described below:

| Count | Date | Mailing |
|-------|------|---------|
| 1 | 9/1/07 | AIG statement mailed to Kirk Wakefield indicating they had received his "Initial Deposit" and that AIG had started "[t]rading" his money. |
| 2 | 6/25/08 | Letter mailed to William Surridge thanking him for "partnering with Diversified Liquid Asset Holdings" and indicating that DLAH had established his "separate account." |
| 3 | 5/15/08 | Letter mailed to Janet and Robert Nykamp acknowledging their $277,533.62 investment into DLAH and that a "separate account" had been established. |

| 4 | 10/1/08 | DLAH joint statement mailed to Raymond and Mildred Boerema stating that interest was "accru[ing]" in their account and their balance was $189,654.68. |
| 5 | 10/1/08 | IOC statement mailed to Joyce Neideffer stating that IOC began "trading" her $500,000 on September 22, 2008, and that she had made $4,500 in interest between September 22, 2008, and September 30, 2008. |
| 6 | 10/1/08 | AIG statement mailed to Mary Ann Bobay stating that she was earning 1.95% monthly interest on her investment. |
| 7 | 8/1/09 | DGF statement mailed to Jeff Roede stating that he had a balance of $50,000 in his DGF account and that he had earned $500 in interest during July 2009. |
| 8 | 8/1/09 | DGF statement mailed to Brian Beckett indicating that as of August 1, 2009, he had $106,204.09 in his DGF account and that he earned $1,061.43 in interest during July 2009. |

18 U.S.C. § 1341

18 U.S.C. § 2

## COUNTS 9-13
### (Money Laundering - David McQueen)

78.    The Grand Jury incorporates into Count 9-13, specifically and by reference and as if stated therein, the allegations and assertions stated in paragraphs 1-77.

On or about the dates listed below, in the Western District of Michigan, Southern Division, and elsewhere,

### DAVID WILSON MCQUEEN

did knowingly engage in monetary transactions by, through, and to financial institutions, affecting interstate commerce, in criminally-derived property of a value greater than $10,000, said property having been derived from specified unlawful activity, namely, mail fraud:

| Count | Date | Transaction |
|-------|------|-------------|
| 9 | December 22, 2008 | MCQUEEN transferred $274,874.96 of AIG and IOC investor funds to New House Title for the purchase of a condominium for him and his wife in Fort Lauderdale, Florida. |
| 10 | September 15, 2008 | MCQUEEN purchased a cashier's check for $14,083 using IOC investor funds payable to Sako Diamond Corp. for final payment on a $24,083 diamond engagement ring. |
| 11 | July 3, 2008 | MCQUEEN wired $25,973.88 of IOC investor funds to Hudsonville Harley Davidson for the purchase of his and hers Harley Davidson motorcycles. |

| 12 | August 5, 2008 | MCQUEEN purchased a $29,850.10 cashier's check using IOC investor funds payable to Riverside Military Academy for son's private boarding school. |
| 13 | June 28, 2007 | MCQUEEN wrote a check to Haisma Design Corp. for $13,260 using AIG investor funds for architectural drawings of a house. |

18 U.S.C. § 1957

## COUNTS 14-15
### (Money Laundering - Trent Francke)

79. The Grand Jury incorporates into Counts 14-15, specifically and by reference and as if stated therein, the allegations and assertions stated in paragraphs 1-77.

On or about the dates listed below, in the Western District of Michigan, Southern Division, and elsewhere,

### TRENT EDWARD FRANCKE

did knowingly engage in monetary transactions by, through, and to financial institutions, affecting interstate commerce, in criminally-derived property of a value greater than $10,000, said property having been derived from specified unlawful activity, namely, mail fraud and securities fraud:

| Count | Date | Transaction |
|-------|------|-------------|
| 14 | August 8, 2008 | FRANCKE wired $248,616.69 in DLAH investor proceeds from the DLAH account #7350 at 5/3rd Bank to his personal account #8538 at 5/3rd Bank. FRANCKE later wired those proceeds to Monex Deposit Company at Farmers and Merchants Bank to purchase 27 gold American Eagle coins, which he kept in his house. |
| 15 | June 25, 2009 | FRANCKE purchased two jet skis and a trailer for $11,000 using investor funds obtained through Capital Credit. |

18 U.S.C. § 1957

## COUNT 16
**(Structuring)**

80.     From on or about January 11, 2010, through on or about January 15,

2010, in Kent County, in the Western District of Michigan, Southern Division,

**DAVID WILSON MCQUEEN,**

knowingly and for the purpose of evading the reporting requirements of section

5313(a) of Title 31, United States Code, and the regulations promulgated

thereunder, did structure the following transactions with a domestic financial

institution, to wit: Defendant withdrew $9,000, $9,000 and $3,000 in U.S. currency

from Huntington National Bank on consecutive business days for the purpose of

avoiding the filing of a currency transaction report by Huntington National Bank.

31 U.S.C. § 5324(a)(3)
31 U.S.C. § 5324(d)(1)
31 C.F.R. Part 103

## COUNT 17
### (Conspiracy to Commit Securities Fraud)

81.     The Grand Jury incorporates into Count 17, specifically and by reference and as if stated therein, the allegations and assertions stated in paragraphs 1-64.

From in or about March 2008, and continuing through November 2010, in the Western District of Michigan, Southern Division, and elsewhere,

**DAVID WILSON MCQUEEN,**
**TRENT EDWARD FRANCKE,**
**JASON ERIC JUBERG**
**a/k/a Jason Eric Toader, and**
**DONALD LAWRENCE JUBERG**

combined, conspired, confederated and agreed with each other and with other persons both known and unknown to the Grand Jury to commit offenses against the United States, that is:

A.      To willfully sell securities without registration, to wit: shares of Diversified Liquid Asset Holdings and Diversified Global Finance, by use of the mails, the wires and other means and instruments of transportation and communication in interstate commerce, in violation of Title 15, United States Code, Section 77e(a)(1) and 77x;

B.      To directly and indirectly use and employ manipulative and deceptive devices and contrivances in connection with the sale of securities, by means and instrumentalities of interstate commerce and the mails, in contravention of Rule 10b-5 (17 C.F.R. § 240.10b-5) of the Rules and Regulations

promulgated by the United States Securities and Exchange Commission, for purposes and with the intention of (i) employing such devices, schemes or artifice to defraud, (ii) making untrue statements of material fact, and (iii) engaging in any act, practice, or course of business which operates or would operate as a fraud or deceit upon other persons in connection with the sale of securities, in violation of Title 15, United States Code, Section 78j and 78ff.

## OBJECT OF THE CONSPIRACY

82.  The object of the conspiracy was to obtain investment funds and commissions through the sale of unregistered securities to unaccredited, unsophisticated investors, and to do so by means of false pretenses and misrepresentations.

## MANNER AND MEANS

83.  It was part of the conspiracy that MCQUEEN and FRANCKE formed investment companies called Diversified Liquid Asset Holdings ("DLAH") and Diversified Global Funding ("DGF").

84.  It was further part of the conspiracy that Defendants and others agreed to sell and did sell approximately $20,000,000 in DLAH and DGF securities directly to the clients of American Benefits Corporation ("ABC") and to the public through general solicitation.

85.  It was further part of the conspiracy that Defendants knowingly sold DLAH and DGF securities to unaccredited, unsophisticated investors, and

encouraged them to mortgage their houses and roll over their IRA accounts to invest.

86.     It was further part of the conspiracy that JASON JUBERG and Matthew Harper created a shell corporation called MMA Magic, for the sole purpose of receiving commissions from MCQUEEN from the sale of DLAH and DGF.

87.     It was further part of the conspiracy that MCQUEEN and FRANCKE used investor funds to make commission payments to JASON JUBERG and Matthew Harper from the sale of DLAH and DGF securities without disclosing to investors the nature or extent of those commissions.

88.     It was further part of the conspiracy that Defendants sold DLAH and DGF securities, knowing, or acting in deliberate ignorance of the fact that DLAH and DGF were securities subject to registration requirements, and that those securities were neither registered nor exempt from registration.

89.     It was further part of the conspiracy that Defendants sought to defraud the United States and avoid detection by the Securities and Exchange Commission and similar State regulatory authorities by misrepresenting the nature of their dealings in connection with the offer and sale of securities.

90.     It was further part of the conspiracy that MCQUEEN and FRANCKE sought to avoid scrutiny from State and Federal regulatory agencies by establishing DGF overseas in New Zealand.

91.     It was further part of the conspiracy that Defendants directed, pressured and lied to ABC insurance agents to convince them to sell DLAH and

DGF securities, knowing or acting with deliberate ignorance of the fact that DLAH and DGF were securities and that those insurance agents were not licensed or otherwise authorized to sell securities.

92.     It was further part of the conspiracy that JASON JUBERG and DONALD JUBERG used ABC's marketing and advertising programs to develop leads that would enable them to sell DLG, DLAH and DGF to the general public.

93.     It was further part of the conspiracy that Defendants and others made untrue statements and misleading omissions of material facts to investors, and engaged in transactions, practices, and a course of business which operated as a fraud or deceit concerning the DLAH investment, including:

A.     Defendants promised "guaranteed" returns of 12% per year on the investment, when they knew those returns were not, and could not, be guaranteed.

B.     Defendants represented to investors that their investment was safe, and that they could not lose their principal investment, when they knew that DLAH was a risky investment, and that investors could lose their principal.

C.     Defendants represented to investors that their investment was in a separate account with DLAH and that their funds could be returned with little or no penalty within a short time after making a redemption request.

D.     Defendants told investors that DLAH was established to invest in "ethanol production related activities" and other investments.   In truth and fact,

DLAH invested only a small fraction of investor dollars in anything that could be considered an investment, ethanol or otherwise.

E. Defendants represented to investors that DLAH produced and facilitated the production of ethanol, and had substantial revenues from the sale or distribution of ethanol and from other ventures. In truth and fact, instead of investing the investors' funds as promised, MCQUEEN and FRANCKE used DLAH investor funds to pay their personal expenses, pay commissions, make interest payments back to investors and satisfy obligations of AIG, IOC, DGF and other ventures unrelated to DLAH.

F. Defendants falsely represented to DLAH investors that they could not lose their principal investment because the investment was backed by the substantial assets of DLAH, including operational ethanol plants that had contracts for the sale of ethanol, when Defendants knew, or acted with deliberate ignorance of the fact, that DLAH had no such plants.

G. Defendants refused or failed to provide any financial statements, documentation or literature relating to the DLAH investment to any of its investors.

H. Defendants falsely represented that they had invested substantial amounts of their own money into DLAH, when they had not.

94. It was further part of the conspiracy that Defendants and others made untrue statements and misleading omissions of material facts to investors, and

engaged in transactions, practices, and a course of business which operated as a fraud or deceit concerning the DGF investment, including:

A.     Defendants promised guaranteed returns of 12%-18% per year plus a "50-50" share of DGF's profits, when they knew those returns were not, and could not, be guaranteed, and that DGF had no profits.

B.     Defendants represented to investors that their investment was safe, and that they could not lose their principal investment, when they knew it was not safe, and that they could lose their principal investment.

C.     Defendants represented to investors that their investment was in a separate account in New Zealand, and that their funds could be returned with little or no penalty within a short time after making a redemption request.

D.     Defendants told investors that DGF was established to invest in green energy related projects, including ethanol production.  In truth and fact, DGF invested only a small fraction of investor dollars in anything that could be considered an investment, green energy or otherwise.

E.     Defendants represented to investors that DGF had substantial revenues from the sale or distribution of ethanol, and other investments.  In truth and fact, instead of investing the investors' funds as promised, MCQUEEN and FRANCKE used DGF investor funds to pay their personal expenses, pay commissions, make interest payments back to investors and satisfy obligations of AIG, IOC, DLAH and other ventures unrelated to DGF.

F.     Defendants falsely represented to DGF investors, orally and/or in DGF investors' applications, that they could not lose their principal investment because the investment was backed by the substantial assets of DGF, including gold reserves and operational ethanol plants.

G.     Defendants refused or failed to provide any financial statements, documentation or literature relating to the DGF investment to any of its investors.

H.     Defendants falsely represented that they had invested substantial amounts of their own money into DGF, when they had not.

95.     It was further part of the conspiracy that Defendants made efforts to delay or deny redemption requests made by investors to avoid dissipation of remaining investor assets in DLAH and DGF.

96.     It was further part of the conspiracy that Defendants used nominees and shell companies to disguise their true roles and participation in the conspiracy.

97.     It was further part of the conspiracy that Defendants failed to return money to investors, including in most cases all or substantially all of the money the investors had placed with the Defendants.

## OVERT ACTS

98.     In furtherance of the conspiracy, and to effect the objects of the conspiracy, the following overt acts, among others, were committed in the Western District of Michigan and elsewhere:

A.     On or about April 8, 2008, JASON JUBERG instructed ABC Agents to "delete all [DLG] Premier Financing power points from your computer (all of them)" and to prepare clients for possible visits from State regulators.

B.     On or about April 8, 2008, MCQUEEN received an inquiry from the State of Michigan, Office of Finance and Insurance Regulation concerning the sale of AIG, IOC, DLAH and other securities.  Shortly thereafter, MCQUEEN used investor funds to hire a consultant for $125,000 to set up an off-shore business to which investor funds could be moved.

C.     On or about April 18, 2008, JASON JUBERG sent an email to ABC Agents about a "mandatory meeting" with a "new company," DLAH, that will provide a new investment option for ABC clients, replacing sales of DLG.

D.     On or about April 23, 2008, MCQUEEN responded to the State of Michigan, Office of Finance and Insurance Regulation request for information concerning his investment companies.  MCQUEEN made several false statements, including that DLAH was a "private real estate funding group" created for "accredited/sophisticated investors."  MCQUEEN stated that "we never have done anything at all with this company,"despite knowing that ABC clients were already being sold interests in DLAH.

E.     On or about April 25, 2008, MCQUEEN signed a "Joint Venture" agreement with Evelyn Wyant, whereby Ms. Wyant agreed to invest $200,000 into DLAH.  In the Joint Venture, MCQUEEN represented that her investment would yield a guaranteed 12% return and that her principal was backed by the assets of

the company and would be used to facilitate ethanol related investments.  JASON JUBERG, through MMA Magic, received a commission of $12,000 for the sale of DLAH to Ms. Wyant.

F.    In or about April 2008, DONALD JUBERG met with Shirley "Betty" Conley to sell her a $50,000 DLG investment.  After DLG was brought under investigation, JUBERG could not complete the sale of DLG investment to Ms. Conley.  JUBERG told Ms. Conley that he had a "better" investment called DLAH that was guaranteed and very safe. Ms. Conley invested $100,000 with DLAH.

G.    On or about June 3, 2008, MCQUEEN and FRANCKE met with John Gregurek to convince him to mortgage his home to invest $245,000 in DLAH. MCQUEEN and FRANCKE told him that DLAH had operational and profitable ethanol plants in Antlers, Oklahoma.  MCQUEEN and FRANCKE also told them that DLAH was making fuel from grape skins in Italy.  MCQUEEN and FRANCKE told him that his investment was "guaranteed" and that DLAH would make his mortgage payments on his behalf.

H.    In or about June 2008, MCQUEEN, FRANCKE, DONALD JUBERG and others met with William Surridge and convinced him to purchase $100,000 in DLAH securities.  MCQUEEN told Mr. Surridge that DLAH was going to use investor dollars to expand the production of its Oklahoma ethanol plant, which was already "sold out" for ten years.  MCQUEEN also told him that then-Governor Arnold Schwarzenegger had sought out DLAH to build another plant in California.

I.    In or about July 2008, MCQUEEN and FRANCKE met with Diane Baker and convinced her to invest $50,000 in DLAH. MCQUEEN and FRANCKE falsely represented that DLAH was very profitable and had a large government contract to provide the military with portable ethanol production facilities that could be used in the Middle East in support of war efforts.

J.    In or about July 2008, DONALD JUBERG convinced Bernard Lyzenga to invest $62,500 from a home equity line into DLAH. JUBERG told Lyzenga that DLAH was making money converting sugar beets into bio-fuels and could provide a safe, guaranteed 12% return.

K.    On or about July 28, 2008, JASON JUBERG sent an email to MCQUEEN and others stating that "independent appraisals of all of Diversified's assets" will be done and MCQUEEN and FRANCKE "expect that number to come in between $100-$200 Million."

L.    In or about August 2008, DONALD JUBERG convinced Larry and Sandra Bryan to invest $44,784.13 of their retirement savings into DLAH. DONALD JUBERG told Mr. and Mrs. Bryan that their investment would be invested completely in "ethanol fuel in Oklahoma," and that DLAH was "sold out" for years and would be a great return "for years to come." DONALD JUBERG told Mr. and Mrs. Bryan that their investment was completely "safe" and was "backed by a corporate guarantee." DONALD JUBERG told Mr. and Mrs. Bryan that it was impossible for them to lose money on their investment. Mr. and Mrs. Bryan later invested another $153,897 into DGF.

M.      From in or about September 2008 through in or about October 2008, JASON JUBERG met with investors Lanny and Jeanette Barendse and convinced them to invest $543,373.30 into DLAH and DGF.  JUBERG told them that DLAH and DGF invested in alternative fuel and offered guaranteed returns of 12% per year.  JUBERG told them that DLAH and DGF were safe investments with no risk.

N.      On or about October 22, 2008, FRANCKE created Capital Credit for the purpose of collecting investor funds and sending them to New Zealand. FRANCKE took a monthly management fee from investor funds for his services.

O.      On or about October 24, 2008, DONALD JUBERG convinced Elizabeth Stroud to invest $50,000 into DGF through Capital Credit.  JUBERG told Ms. Stroud that DGF held government contracts for the sale of wind power and that he invested much of his own personal investment portfolio with DGF.  JUBERG also told Ms. Stroud that he would personally guarantee her investment so that she would not risk losing her principal.

P.      On or about October 28, 2008, JASON JUBERG convinced Patrick Cadaret to invest $99,735 into DGF.  In that meeting and later meetings, JUBERG represented that the DGF investment returned a guaranteed 12% on his investment, plus a 20% equity bonus up to an 18% total return.  JUBERG promised Mr. Cadaret that the guarantee was extended exclusively to him.  JUBERG told Mr. Cadaret that ABC clients had invested $65,000,000 with DGF and had never lost money.

Q.      On or about October 31, 2008, MCQUEEN emailed JASON JUBERG a Depository Account Agreement in which he stated that DGF's account holders' principal and interest are "guaranteed by the finance company which is backed by its guarantee from a Top 100 World Bank."

R.      On or about October 31, 2008, JASON JUBERG emailed MCQUEEN telling him that it would "be extremely helpful" to him if MCQUEEN lowered the promised rate of return on the DGF investment from 18% to 12%, to make it easier to sell to investors who might be suspicious of such a high rate of return.

S.      On or about November 17, 2008, JASON JUBERG convinced John and Josephine Mackus to roll over their existing $53,049 IRA into DGF. JUBERG told Mr. and Mrs. Mackus that their investment into DGF was safe and guaranteed and that he had done a thorough investigation into MCQUEEN and his investment companies and could vouch for them.

T.      In or about November 2008, JASON JUBERG convinced Vernon Bontrager to invest his $180,503.87 IRA into DGF.  JUBERG called Mr. Bontrager's IRA administrator and impersonated Mr. Bontrager in an effort to "assist" Mr. Bontrager with the roll-over.  Mr. Bontrager incurred a $10,000 penalty for early withdrawal, which JUBERG stated would be of no consequence because Mr. Bontrager was much better off in DGF.  JUBERG told Mr. Bontrager that DGF was insured and that he could never lose any money.

U.     In January 2009, JASON JUBERG convinced DLAH investor Gary Rudd that, despite his concerns about DLAH, he should not take his $70,000 out of DLAH.   JUBERG told Mr. Rudd that MCQUEEN's investments were safe and guaranteed, and that Mr. Rudd should invest more so that he could make a guaranteed return of 12-18%.   Mr. Rudd combined his DLAH investment with $30,000 to invest $100,000 into DGF.  JUBERG told Mr. Rudd that DGF had made millions investing in distressed properties in California.

V.     On or about January 12, 2009, MCQUEEN sent an email to an ABC employee admonishing her for sending correspondence concerning "consultant fees" paid to JASON JUBERG. MCQUEEN warned that such emails might raise the suspicious of the "SEC."  MCQUEEN asked that "from now on . . . please print your findings and send them with Jason for he and I to go over" in person.

W.     On or about January 13, 2009, JASON JUBERG convinced Glen Guarisco to invest $325,493.73 into DGF, telling him that DGF was a well-run hedge fund.

X.     In or about February 2009, JASON JUBERG convinced Roger Lamer to invest $100,000 into DGF.  JUBERG told Mr. Lamer that DGF developed condominium projects in Australia or New Zealand.  JUBERG told Mr. Lamer that DGF was a safe investment and that he and his employees had invested money with DGF.

Y.     In or about March 2009, JASON JUBERG convinced Jill Parsons to roll over $218,886.73 from an IRA into DGF.  JUBERG told Ms. Parsons

that DGF was a "private equity" fund investing in solar and green energy. JUBERG told Ms. Parsons that DGF was safe and that she could not lose money, and that he and his father had invested over $800,000 into DGF.

Z.    In or about March 2009, JASON JUBERG and Matthew Harper convinced Kay Malocha to roll over $100,000 from her IRA into DGF because DGF was safer than any annuity and provided guaranteed returns. JUBERG told Ms. Malocha that she could not lose money.

AA.    In or about March 2009, DONALD JUBERG convinced Louis Pastorick to invest $224,640.76 with DGF. JUBERG told Mr. Pastorick that his investment was guaranteed at 12% plus an additional bonus. JUBERG represented that DGF had "wind farms and ethanol plants in California."

BB.    On or about March 1, 2009, MCQUEEN and FRANCKE notified DLAH investors that they would no longer make their mortgage payments for them, and that they would be responsible for paying their own mortgage out of their DLAH interest payments.

CC.    On or about March 19, 2009, DONALD JUBERG called DLAH investor Wilma Cline and assured her that DLAH was different from DLG and was "perfectly safe." JUBERG reassured her that DLAH was in compliance with all securities laws, was going to "go public" and would be registered in the State of Michigan and federally within two months.

DD.    In or about April 2009, JASON JUBERG convinced Joseph Yantis to invest $327,130.99 into DGF. JUBERG told Mr. Yantis that DGF had

made substantial profits in international business opportunities. Mr. Yantis later met with MCQUEEN who told him that DGF had made money from the sale of mobile ethanol labs, and was on the cusp of a major deal with the Vietnamese government.

EE.    From about June to August 2009, MCQUEEN and FRANCKE sent letters to DLAH investors urging them not to withdraw their money from their accounts because DLAH was on the cusp of a major ethanol deal, and telling those investors that they should not have any "immediate need for" their investment funds because they had verified in their investment documents that they were "accredited investors" with significant net worth.

FF.    In or about August 2009, MCQUEEN spoke with DLAH investor Robert Nykamp, who had made several requests to withdraw the balance in his DLAH account so that he could pay off the mortgage he had incurred to invest. MCQUEEN told him that his money was "tied-up" in offshore investments and could not be returned for several weeks. Mr. Nykamp never received his money.

GG.    On or about August 24, 2009, MCQUEEN and FRANCKE stopped making interest payments to DLAH and DGF investors.

HH.    On or about March 30, 2010, MCQUEEN responded to inquiries from the State of Michigan, Office of Finance and Insurance Regulation request for information concerning DGF.

II.    Counts 18-28 are incorporated herein as Overt Acts.

18 U.S.C. § 371
15 U.S.C. § 77e(a)(1)
15 U.S.C. § 77x
15 U.S.C. § 78j(b)
15 U.S.C. § 78ff

## COUNT 18-20
### (Securities Fraud)

99.     The Grand Jury incorporates into Counts 18-20, specifically and by reference and as if stated therein, the allegations and assertions stated in paragraphs 1-64 and 81-98.

Beginning in or about March 2008 and continuing through in or about November 2010, in the Southern Division of the Western District of Michigan, and elsewhere,

**DAVID WILSON MCQUEEN,**
**JASON ERIC JUBERG**
**a/k/a Jason Eric Toader, and**
**DONALD LAWRENCE JUBERG**

unlawfully, willfully and knowingly, by use of means and instrumentalities of interstate commerce and the mails, directly and indirectly did use and employ manipulative and deceptive devices and contrivances in connection with the sale of securities, in contravention of Rule 10b-5 (17 C.F.R. § 240.10b-5) of the Rules and Regulations promulgated by the United States Securities and Exchange Commission, and did in connection with the investor and amount identified in each count below: (a) employ a device, scheme and artifice to defraud, (b) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in light of the circumstance under which they were made, not misleading, and (c) engage in acts, practices and a course of business

which would and did operate as a fraud and deceit upon purchasers and potential purchasers of securities:

| Count | Date | Investment | Investment Amount | Investor |
|-------|------|------------|-------------------|----------|
| 18 | 6/26/08 | DLAH | $100,000 | William Surridge |
| 19 | 12/10/08 | DGF | $170,385.41 | Ruth Ann Klinge |
| 20 | 3/3/09 | DGF | $224,640.76 | Louis Pastorick |

15 U.S.C. § 78j(b)
15 U.S.C. § 78ff
18 U.S.C. § 2

## COUNTS 21-24
### (Sale of Unregistered Securities)

100.   The Grand Jury incorporates into Counts 21-24, specifically and by reference and as if stated therein, the allegations and assertions stated in paragraphs 1-64 and 81-98.

On or about the dates listed below, in the Southern Division of the Western District of Michigan,

**DAVID WILSON MCQUEEN,**
**JASON ERIC JUBERG**
**a/k/a Jason Eric Toader, and**
**DONALD LAWRENCE JUBERG**

did willfully sell and cause to be sold unregistered and non-exempt securities through the mails and using any means or instruments of interstate transportation and communication in interstate commerce.

| Count | Date | Investment | Investment Amount | Investor |
|-------|------|------------|-------------------|----------|
| 21 | 10/3/08 | DLAH | $155,000 | George and Cherry Moeslein |
| 22 | 8/20/08 | DLAH | $100,000 | Clifford Wyss |
| 23 | 8/18/08 | DLAH | $150,000 | Stephen DeWilde |
| 24 | 11/14/08 | DGF | $100,000 | Myrtle Adams |

15 U.S.C. § 77e(a)
15 U.S.C. § 77x
18 U.S.C. § 2

## COUNT 25-28
## (Sale of Unregistered Securities)

101.   The Grand Jury incorporates into Counts 25-28, specifically and by reference and as if stated therein, the allegations and assertions stated in paragraphs 1-64 and 81-98.

On or about the dates listed below, in the Southern Division of the Western District of Michigan,

**DAVID WILSON MCQUEEN and
JASON ERIC JUBERG
a/k/a Jason Eric Toader**

did willfully sell and cause to be sold unregistered and non-exempt securities through the mails and using any means or instruments of interstate transportation and communication in interstate commerce.

| Count | Date | Investment | Investment Amount | Investor |
|-------|------|------------|-------------------|----------|
| 25 | 12/9/08 | DGF | $119,235 | Norman Westrate |
| 26 | 2/25/09 | DGF | $110,000 | Sally Ann Forcum |
| 27 | 3/10/09 | DGF | $181,497.50 | Roger Haataja |
| 28 | 4/20/09 | DGF | $102,000 | Floyd Zarobinski |

15 U.S.C. § 77e(a)
15 U.S.C. § 77x
18 U.S.C. § 2

## COUNT 29
### (Conspiracy to Commit Money Laundering)

102.  The Grand Jury incorporates by reference the allegations made in paragraphs 1-64 and 81-98, which are re-alleged and incorporated as if fully set forth herein.

From in or about March 2009 to and including December 2012, in the Southern Division of the Western District of Michigan,

### JASON ERIC JUBERG
### a/k/a Jason Eric Toader
### DONALD LAWRENCE JUBERG and

combined, conspired, confederated and agreed with each other and with other persons both known and unknown to the Grand Jury, to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce, which involved the proceeds of a specified unlawful activity, that is, mail fraud and securities fraud, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership, or the control of the proceeds of a specified unlawful activity, and that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

### OBJECT OF THE CONSPIRACY

103.  The object of the conspiracy was to conceal and disguise the proceeds of mail fraud and securities fraud.

## MANNER AND MEANS

104.    It was part of the conspiracy that JASON JUBERG and DONALD JUBERG received proceeds from mail fraud and securities fraud in the form of commissions, fees and other payments.

105.    It was further part of the conspiracy that from March 2009 through June 2009, after learning of the existence of investigations by State and Federal regulatory and law enforcement agencies concerning the sale of unregistered securities, JASON JUBERG, DONALD JUBERG, and Matthew Harper transferred proceeds of mail and securities fraud to Penny Hodge.  The animating purpose of those transactions was to conceal and disguise the location and ownership of those funds.

106.    It was further part of the conspiracy that JASON JUBERG and DONALD JUBERG insisted that Penny Hodge take funds from them without memorializing the transfers in any contract or agreement.

107.    It was further part of the conspiracy that JASON JUBERG and DONALD JUBERG told Ms. Hodge to invest and/or hold the JUBERGs' funds until such time as the investigation and/or litigation into their sale of securities was completed.

108.    It was further part of the conspiracy that Ms. Hodge agreed with JASON JUBERG, DONALD JUBERG and Matthew Harper that, while the investigation was pending, she would pay expenses or provide cash to JASON

JUBERG, DONALD JUBERG and Matthew Harper if they should need access to the funds.

109. It was further part of the conspiracy that, at JASON JUBERG's request, Ms. Hodge paid JASON JUBERG's expenses with money he had transferred to her while the investigation was pending so that he could continue his lifestyle and conduct business in a manner to which he had grown accustomed.

110. It was further part of the conspiracy that the JASON JUBERG and DONALD JUBERG used aliases and/or relied upon relatives and friends, and other nominees, to conceal their assets by placing money into their relatives and friends' accounts.

18 U.S.C. § 1956(h)
18 U.S.C. § 1956(a)(1)(B)(i) & (ii)
18 U.S.C. § 1956(c)

## COUNT 30
### (Structuring)

111.    From on or about November 29, 2012, through on or about December 7, 2012, in Kent County, in the Western District of Michigan, Southern Division,

### DONALD LAWRENCE JUBERG,

knowingly and for the purpose of evading the reporting requirements of section 5313(a) of Title 31, United States Code, and the regulations promulgated thereunder, did structure the following transactions with a domestic financial institution, to wit: Defendant withdrew $2,000, $3,000, $2,500, $2,000, $2,500, $2,000, $3,000, $2,000 and $2,000 in U.S. currency from Lake Michigan Credit Union on consecutive business days for the purpose of avoiding the filing of a currency transaction report by Lake Michigan Credit Union.

31 U.S.C. § 5324(a)(3)
31 U.S.C. § 5324(d)(1)
31 C.F.R. Part 103

## COUNT 31
### (Money Laundering)

112.  On or about July 23, 2010, in the Southern Division of the Western District of Michigan and elsewhere,

### DAVID WILSON MCQUEEN

did knowingly conduct and cause to be conducted a financial transaction affecting interstate and foreign commerce, to wit, the transfer of approximately $12,500 from Penny Hodge to MCQUEEN, which involved the proceeds of a specified unlawful activity, that is mail and securities fraud, knowing that the transaction was designed in whole and in part to conceal and disguise, the nature, location, source, ownership, and control of the proceeds of the specified unlawful activity and that while conducting and attempting to conduct such financial transaction knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity.

18 U.S.C. § 1956(a)(1)(B)(i)
18 U.S.C. § 2

## COUNT 32
### (Money Laundering)

113. On or about August 28, 2008, in the Southern Division of the Western District of Michigan,

### DAVID WILSON MCQUEEN

did knowingly conduct and cause to be conducted a financial transaction affecting interstate and foreign commerce, to wit, the transfer of $48,541.44 from Bertuca Bonding and Insurance to Fifth Third Bank for payment on a 1999 Avenger boat loan, which involved the proceeds of a specified unlawful activity, that is mail and securities fraud, knowing that the transaction was designed in whole and in part to conceal and disguise, the nature, location, source, ownership, and control of the proceeds of the specified unlawful activity and that while conducting and attempting to conduct such financial transaction knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity.

18 U.S.C. § 1956(a)(1)(B)(i)
18 U.S.C. § 2

**COUNTS 33-36**
**(Mail Fraud)**

114.   The Grand Jury incorporates into Counts 33-36, specifically and by reference and as if stated therein, the allegations and assertions stated in paragraphs 1-64.

From in or about late 2007 through in or about 2010, in the Western District of Michigan, Southern Division, and elsewhere,

**TRENT EDWARD FRANCKE,**

and others known and unknown to the Grand Jury, did knowingly, and with the intent to defraud, devise a scheme and artifice to defraud and to obtain money and property by means of material false and fraudulent pretenses, representations and promises.

**MEANS AND METHODS**

115.   It was part of the scheme to defraud that FRANCKE falsely and fraudulently represented to investors that his investment companies Genesis and Armex were successful, and had generated profits from investments in real estate, gold, currency exchanges and green energy.  FRANCKE represented that Genesis and Armex's investments produced sufficient revenue to satisfy promised returns of 4-5% per month to investors.

116.   It was further part of the scheme to defraud that FRANCKE falsely and fraudulently led investors to believe that their investments were safe and guaranteed and backed by significant assets of the companies, including gold.

117.   It was further part of the scheme to defraud that FRANCKE falsely and fraudulently represented to investors that he would take no fees or commissions out of their investments and only make money by generating profits above and beyond what they paid back to investors, when, in fact, FRANCKE diverted investor dollars to himself or to pay commissions to those that referred him new investors.

118.   It was further part of the scheme to defraud that to convince investors that their money was generating profits from their investments, FRANCKE made monthly payments to investors using the investors' principal investment or new investor funds, and disguising those payments as "interest."

119.   It was further part of the scheme to defraud that FRANCKE failed to disclose that he made interest payments and satisfied redemption requests using other investors' funds.

120.   It was further part of the scheme to defraud that FRANCKE mailed false and misleading monthly account statements that contained material misrepresentations, fabricated account balances, interest earned amounts and interest rate figures.

121.   It was further part of the scheme to defraud that FRANCKE would prey upon vulnerable individuals, including the elderly, who often mortgaged their homes or cashed in their retirement accounts to invest.

122.   It was further part of the scheme to defraud that FRANCKE used his affiliation with certain churches to lure investors.   FRANCKE represented to

investors that he was guided by his faith and "ordained by God" in his dealings with investors, knowing that his representations would endear the trust of certain investors.

123.   It was further part of the scheme to defraud that FRANCKE failed to return money to investors, including in most cases all or substantially all of the money the investors had placed with FRANCKE.

## THE MAILINGS

124.   In order to execute the scheme, Defendant did send through the Postal Service in the Western District of Michigan and knowingly cause to be sent, delivered and received from the Postal Service, according to the directions thereon, the items and things described below:

| Count | Date | Mailing |
|---|---|---|
| 33 | 2/1/08 | Genesis Equity Group, LLC statement mailed to Kenneth Knoll stating that he had a "balance" in his investment account of $100,000, and was earning $3,000 interest each month. |
| 34 | 1/1/09 | Genesis Equity Group, LLC statement mailed to Mary Malloy indicating that she had a "balance" in her investment account of $50,000, and was earning $1,500 interest each month. |
| 35 | 8/1/09 | Genesis Equity Group, LLC statement mailed to Elle VanderLoon stating that she had a "balance" in her first investment account of $25,000, earning $1,000 each month, and a balance in her second investment account of $41,039.71, earning $1,578.45 in the month of July 2009. |

| 36 | 8/1/09 | Genesis Equity Group, LLC statement mailed to Nancy Volpe stating that she a "balance" in her investment account of $123,037.81 and earned $2,412.51 in the month of July 2009. |

18 U.S.C. § 1341
18 U.S.C. § 2

## COUNT 37

### (Failure to File Tax Return)

During the calendar year 2007, in the Southern Division of the Western District of Michigan,

### DAVID WILSON MCQUEEN,

who was a resident of Byron Center, Michigan, did receive taxable income of $906,343 and, by reason of such income, was required by law, following the close of the calendar year 2007 and on or before April 15, 2008, to make an income tax return to the Internal Revenue Service Center at Kansas City, Missouri, to a person assigned to receive returns at the local office of the Internal Revenue Service at Kansas City, Missouri, or to another Internal Revenue Service office permitted by the Commissioner of Internal Revenue, stating specifically the items of his income and any deductions and credits to which he was entitled, and knowing all of the foregoing, Defendant did willfully fail, on or before April 15, 2008, to make a federal income tax return.

26 U.S.C. § 7203

## COUNT 38
### (Failure to File Tax Return)

During the calendar year 2008, in the Southern Division of the Western District of Michigan,

**DAVID WILSON MCQUEEN,**

who was a resident of Byron Center, Michigan, did receive taxable income of $1,441,946 and, by reason of such income, was required by law, following the close of the calendar year 2008 and on or before April 15, 2009, to make an income tax return to the Internal Revenue Service Center at Kansas City, Missouri, to a person assigned to receive returns at the local office of the Internal Revenue Service at Kansas City, Missouri, or to another Internal Revenue Service office permitted by the Commissioner of Internal Revenue, stating specifically the items of his income and any deductions and credits to which he was entitled, and knowing all of the foregoing, Defendant did willfully fail, on or before April 15, 2009, to make a federal income tax return.

26 U.S.C. § 7203

## COUNT 39
### (Failure to File Tax Return)

During the calendar year 2009, in the Southern Division of the Western District of Michigan,

### DAVID WILSON MCQUEEN,

who was a resident of Byron Center, Michigan, did receive taxable income of $889,213 and, by reason of such income, was required by law, following the close of the calendar year 2009 and on or before April 15, 2010, to make an income tax return to the Internal Revenue Service Center at Kansas City, Missouri, to a person assigned to receive returns at the local office of the Internal Revenue Service at Kansas City, Missouri, or to another Internal Revenue Service office permitted by the Commissioner of Internal Revenue, stating specifically the items of his income and any deductions and credits to which he was entitled, and knowing all of the foregoing, Defendant did willfully fail, on or before April 15, 2010, to make a federal income tax return.

26 U.S.C. § 7203

## COUNT 40
### (Failure to File Tax Return)

During the calendar year 2007, in the Southern Division of the Western District of Michigan,

### TRENT EDWARD FRANCKE,

who was a resident of Caledonia, Michigan, did receive taxable income of $465,144 and, by reason of such income, was required by law, following the close of the calendar year 2007 and on or before April 15, 2008, to make an income tax return to the Internal Revenue Service Center at Kansas City, Missouri, to a person assigned to receive returns at the local office of the Internal Revenue Service at Kansas City, Missouri, or to another Internal Revenue Service office permitted by the Commissioner of Internal Revenue, stating specifically the items of his income and any deductions and credits to which he was entitled, and knowing all of the foregoing, Defendant did willfully fail, on or before April 15, 2008, to make a federal income tax return.

26 U.S.C. § 7203

## COUNT 41
### (Failure to File Tax Return)

During the calendar year 2008, in the Southern Division of the Western District of Michigan,

**TRENT EDWARD FRANCKE,**

who was a resident of Caledonia, Michigan, did receive taxable income of $811,737 and, by reason of such income, was required by law, following the close of the calendar year 2008 and on or before April 15, 2009, to make an income tax return to the Internal Revenue Service Center at Kansas City, Missouri, to a person assigned to receive returns at the local office of the Internal Revenue Service at Kansas City, Missouri, or to another Internal Revenue Service office permitted by the Commissioner of Internal Revenue, stating specifically the items of his income and any deductions and credits to which he was entitled, and knowing all of the foregoing, Defendant did willfully fail, on or before April 15, 2009, to make a federal income tax return.

26 U.S.C. § 7203

## COUNT 42
### (Failure to File Tax Return)

During the calendar year 2009, in the Southern Division of the Western District of Michigan,

### TRENT EDWARD FRANCKE,

who was a resident of Caledonia, Michigan, did receive taxable income of $405,590 and, by reason of such income, was required by law, following the close of the calendar year 2009 and on or before April 15, 2010, to make an income tax return to the Internal Revenue Service Center at Kansas City, Missouri, to a person assigned to receive returns at the local office of the Internal Revenue Service at Kansas City, Missouri, or to another Internal Revenue Service office permitted by the Commissioner of Internal Revenue, stating specifically the items of his income and any deductions and credits to which he was entitled, and knowing all of the foregoing, Defendant did willfully fail, on or before April 15, 2010, to make a federal income tax return.

26 U.S.C. § 7203

**(Forfeiture Allegation - Mail Fraud)**

The allegations contained in Counts 1-8 of this Fourth Superseding Indictment are hereby re-alleged and incorporated by reference.  Upon conviction of one or more of the offenses in violation of Title 18, United States Code, Section 1341 set forth in this Fourth Superseding Indictment,

**DAVID WILSON MCQUEEN and**
**TRENT EDWARD FRANCKE**

shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense.  The property to be forfeited includes, but is not limited to, the following:

1.    MONEY JUDGMENT: By virtue of the commission of the felony violations alleged in Counts 1-8 of this Fourth Superseding Indictment, Defendants shall forfeit to the United States the sum of at least $46,500,000, which represents the proceeds from the fraud alleged in Counts 1-8 of the Fourth Superseding Indictment.

2.    BANK ACCOUNTS:

    A.    $126,008.44 in Funds from JP Morgan Account #718562481, in the name of Capital Credit Inc. Trust Account FBO Diversified Global finance LTD;

    B.    $99,385.34 in Funds from JP Morgan Account #718563141, in the name of Capital Credit Inc. Trust Account FBO Diversified Global finance LTD;

C.   $64,109.22 in Funds from JP Morgan Account #718563182, in the name of International Opportunity Consultants;

D.   $18,342.30 in Funds from JP Morgan Account #786903898, in the name of DAVID WILSON MCQUEEN;

E.   $14,850.36 in Funds from JP Morgan Account #718563158, in the name of Diversified Liquid Asset Holdings LLC;

F.   $31,325.20 in Funds from JP Morgan Account #786903906, in the name of DAVID WILSON MCQUEEN; and

G.   $79,448.33 in Funds from JP Morgan Account #718563257, in the name of Capital Credit Inc. Trust Account FBO Diversified Global finance LTD.

3.   REAL PROPERTY:

All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements located at 511 SE 5th Avenue, Unit 1219, Fort Lauderdale, Florida, Broward County, Together with All Improvements, Fixtures and Appurtenances Thereto, further described as follows:

Condominium Parcel No. 1219 (the "Unit") of Nuriver Landing, a Condominium, according to the Declaration of Condominium Thereof, as recorded in Official Records Book 41470, at Page 1990, of the Public Records of Broward County, Florida, as amended, together with an undivided interest or share in the common elements appurtenant thereto.

Parcel ID #: 10210-BE-15400.

Titled in the name of David W. McQueen.

4.     PERSONAL PROPERTY:

    A.     Collectible Coins valued at $126,167.00 seized from the residence of TRENT EDWARD FRANCKE; and

    B.     One 1999 38 Ft. Powerquest Avenger Boat, Serial No. PPN 38063H899, with Integrity Trailer, VIN 4VUBB383XXNOO2562, seized from DAVID WILSON MCQUEEN;

    C.     One 2008 Harley Davidson Motorcycle registered to David W. McQueen, VIN 1HD1KB4159Y691309.

    D.     One 1990 37 Ft. Chriscraft Cabin Boat, Title No. 263Z1580503, Hull No. CCNYM192J990, registered to Guardian International.

5.     SUBSTITUTE ASSETS:  If any of the property described above, as a result of any act or omission of Defendants:

    A.     cannot be located upon the exercise of due diligence;

    B.     has been transferred or sold to, or deposited with, a third party;

    C.     has been placed beyond the jurisdiction of the court;

    D.     has been substantially diminished in value; or

    E.     has been commingled with other property which cannot be divided without difficulty, the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

18 U.S.C. § 981(a)(1)(C)
28 U.S.C. § 2461(c)
21 U.S.C. § 853(p)

**(Forfeiture Allegation - Securities Fraud)**

The allegations contained in Counts 17-20 of this Fourth Superseding Indictment are hereby re-alleged and incorporated by reference.  Upon conviction of conspiracy to commit securities fraud or securities fraud, as set forth in this Fourth Superseding Indictment,

**DAVID WILSON MCQUEEN,**
**TRENT EDWARD FRANCKE,**
**JASON ERIC JUBERG**
**a/k/a Jason Eric Toader, and**
**DONALD LAWRENCE JUBERG,**

shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses.  The property to be forfeited includes, but is not limited to, the following:

1.    MONEY JUDGMENT: By virtue of the commission of the felony violations alleged in Counts 17-20 of this Fourth Superseding Indictment, Defendants shall forfeit to the United States the sum of at least $20,000,000, which represents proceeds from the securities fraud alleged in Counts 17-20 of this Fourth Superseding Indictment.

2.    SUBSTITUTE ASSETS:  If any of the property described above, as a result of any act or omission of Defendants:

      A.    cannot be located upon the exercise of due diligence;

B.      has been transferred or sold to, or deposited with, a third party;

C.      has been placed beyond the jurisdiction of the court;

D.      has been substantially diminished in value; or

E.      has been commingled with other property which cannot be divided without difficulty, the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

18 U.S.C. § 981(a)(1)(C)
28 U.S.C. § 2461(c)
21 U.S.C. § 853(p)

**(Forfeiture Allegation - Money Laundering Conspiracy)**

The allegations contained in Count 29 of this Fourth Superseding Indictment are hereby re-alleged and incorporated by reference.   Upon conviction of the conspiracy to commit money laundering, in violation of Title 18, U.S.C. § 1956, the defendants,

**JASON ERIC JUBERG**
**a/k/a Jason Eric Toader and**
**DONALD LAWRENCE JUBERG,**

shall forfeit to the United States all right, title, and interest in any and all property involved in the money laundering offense in violation of Title 18, U.S.C. § 1956, and all property traceable to such property, including but not limited to the following:

1.      MONEY JUDGMENT: By virtue of the commission of the felony violation alleged in Counts 29 of this Fourth Superseding Indictment, Defendants shall forfeit to the United States the sum of at least $800,000, which represents the amount of money involved in the money laundering offense.

2.      SUBSTITUTE ASSETS - If any of the above-described forfeitable property, as a result of any act or omission of the defendants,

      A.      cannot be located upon the exercise of due diligence;

      B.      has been transferred or sold to, or deposited with, a third party;

      C.      has been placed beyond the jurisdiction of the court;

      D.      has been substantially diminished in value; or

      E.      has been commingled with other property which cannot be

divided without difficulty, it is the intent of the United States, pursuant to 21 U.S.C

§ 853(p), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described above, as being subject to forfeiture.

18 U.S.C. § 982(a)(1)
18 U.S.C. § 1956

A TRUE BILL

_____

GRAND JURY FOREPERSON

ANDREW B. BIRGE
Attorney for the United States,
Acting Under Authority Conferred
by 28 U.S.C. § 515

_____

MATTHEW G. BORGULA
SALLY J. BERENS
Assistant United States Attorneys
TIMOTHY S. LEIMAN
Special Assistant United States Attorney